UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| E.C., by next friends Mario C. and Kim C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:19-cv-03563-JPH-CSW |
| COMMUNITY SCHOOL CORPORATION OF EASTERN HANCOCK COUNTY, COMMUNITY SCHOOL CORPORATION OF SOUTHERN HANCOCK COUNTY, SAMSON T. LIVINGSTON, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER GRANTING SCHOOL-CORPORATION DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

E.C., a young woman who is cognitively disabled, brings federal and state claims based on allegations that she was sexually assaulted by another student in a school bathroom. Two of the defendants are school corporations, which have filed motions for summary judgment. For the reasons below, those motions are **GRANTED in part** as to E.C.'s federal claims. Dkt. [210]; dkt. [214]. The parties shall have **through September 22, 2023** to show cause why the Court should not relinquish jurisdiction over the state-law claims remaining in this case.

**I.
Facts and Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to

the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

## A. E.C. and Mr. Livingston

In late 2017, E.C.,[1] who is developmentally and cognitively disabled, was a 15-year-old freshman at Eastern Hancock High School ("EHHS"). Dkt. 65-2 at 5 (Parker Rep. at 5); dkt. 223-22 at 1. EHHS is operated by the Community School Corporation of Eastern Hancock County ("Eastern Hancock"). Dkt. 223-12 at 1 (Truitt 2020 Aff. ¶ 5). E.C.'s cognitive ability and social skills are like "an elementary school-age child," dkt. 65-2 at 9 (Parker Rep. at 9), and her mind is "much more child-like than her physical appearance," dkt. 223-12 at 4 (Truitt 2020 Aff. ¶ 19). She was in special education throughout her schooling. Dkt. 65-2 at 9 (Parker Rep. at 9).

Around early November 2017, E.C. met Samson Livingston, a senior at EHHS, at EHHS's homecoming dance. Dkt. 223-5 at 39 (Livingston Dep. at 38:15–18). Though the precise details are unclear, K.D.[2]—a classmate who school officials knew once wanted to be E.C.'s boyfriend—played some role in introducing the two. *See* dkt. 223-5 at 39–40 (Livingston Dep. at 38:19–39:3); dkt. 223-12 at 6–7 (Truitt 2020 Aff. ¶¶ 28, 30); dkt. 223-15 at 31 (E.C. Dep. at

---

[1] E.C. has been granted leave to proceed in this litigation under a pseudonym. Dkt. 9. And her parents' last name is also withheld to protect her anonymity.

[2] Like the parties do, the Court uses initials to refer to minors involved in the facts of this case. *See* Fed. R. Civ. P. 5.2(a).

30:24–25); dkt. 223-20 at 28–29 (Kim C. Dep. at 112:19–113:11).[3]  E.C. and

Mr. Livingston started texting about a week later, and their conversation

turned sexual on November 6.  Dkt. 223-5 at 43, dkt. 223-6 at 28 (Livingston

Dep. at 42:4–7, 133:19–25); *see* dkt. 223-17 (November 6 text messages).  That

evening, Mr. Livingston asked E.C. to have sex with him in a school bathroom

the next day.  Dkt. 223-17 at 18, 21–22.

The next morning, November 7, 2017, E.C. and Mr. Livingston were

holding hands in the school hallways.  Dkt. 223-6 at 37 (Livingston Dep. at

142:7–15).  Mr. Livingston said he didn't know if any teachers or staff members

saw them do this, *id.*, but the assistant principal, Lisa Truitt, said that any

school employee would have reported this to the special education teacher,

Shantelle Ebbert, dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 29).

Around 10:15 a.m., E.C. told her teacher she needed to use the

bathroom.  Dkt. 223-15 at 73 (E.C. Dep. at 72:10–17).  She then texted Mr.

Livingston that the girls' restroom was empty.  Dkt. 223-16 at 13.  Mr.

Livingston arrived five minutes later, dkt. 223-2 at 7, and he and E.C. had

sexual contact, *see* dkt. 223-12 at 5 (Truitt 2020 Aff. ¶¶ 24; 26).

When EHHS employees learned about the incident, they contacted the

Indiana Department of Child Services, the Sheriff's Department, and both

students' parents.  Dkt. 223-1 at 25 (Pfaff Dep. at 97:15–17); dkt. 223-5 at 100

---

[3] Eastern Hancock disputes whether admissible evidence shows that K.D. introduced
E.C. to Mr. Livingston at the homecoming dance, *see* dkt. 244 at 4, but this cited
designated evidence supports a reasonable inference that he did.

(Livingston Dep. at 99:20–25); dkt. 223-20 at 16 (Kim C. Dep. at 61:4–62:17); dkt. 223-22 (Probable Cause Aff.).[4]

EHHS and Mr. Livingston's parents agreed to allow him to finish his remaining courses remotely. Dkt. 223-1 at 28–29 (Pfaff Dep. at 109:11–110:2, 113:9–114:7). The school also worked with E.C.'s parents to create a safety plan, which provided that E.C. would be escorted at all times on school grounds. *Id.* at 29 (Pfaff Dep. at 116:6–22); dkt. 223-23 at 6–7 (Email conversation between E.C.'s parents and Ms. Ebbert); *id.* at 8 (Safety Plan). There's no designated evidence that E.C. was subjected to further sexual harassment or assault at EHHS. *See, e.g.*, dkt. 223-19 at 6 (Mario C. Dep. at 97:12–16).

### B. Incidents at New Palestine High School Involving Mr. Livingston

Before transferring to EHHS, Mr. Livingston attended New Palestine High School (NPHS) from Fall 2014 through Fall 2016. Dkt. 210-9 at 2 (Hercamp Aff. ¶ 5). NPHS is operated by Community School Corporation of Southern Hancock County ("Southern Hancock"). Dkt. 210-8 at 1 (Fessler Aff. ¶ 3). Mr. Livingston received special education services throughout his high school career. *Id.* (Fessler Aff. ¶ 4); dkt. 223-5 at 102 (Livingston Dep. at 101:19–21).

At the start of his freshman year, Mr. Livingston was disciplined for putting a laxative in a female classmate's coffee. Dkt. 223-8 at 19 (Fessler Dep. at 74:24–75:1); dkt. 223-5 at 21–22 (Livingston Dep. at 20:3–21:16); dkt. 201-4

---

[4] Mr. Livingston was charged with sexual misconduct with a minor, a Level 5 felony, and the charge was later dismissed. *See State v. Livingston*, No. 30C01-1711-FR-002430 (Hancock Cir. Ct. 2017).

at 1–4.  NPHS officials disciplined Mr. Livingston, dkt. 201-4 at 1–4, but did not consider this to have been sexual harassment, dkt. 223-8 at 19 (Fessler Dep. at 75:2–4).

Early in his sophomore year at NPHS, Mr. Livingston's former girlfriend, J.R., sent an email to an NPHS guidance counselor saying that Mr. Livingston "has been begging me to have intercourse with him" and "has been sexually harassing me for a couple days now."  Dkt. 210-4 at 5; dkt. 223-5 at 26 (Livingston Dep. at 25:14–15).  School officials said that J.R. had a reputation of "making false accusations against fellow students in order to get them in trouble (including those of a sexual nature) and then recanting her allegations when asked about them."  Dkt. 210-9 at 3 (Hercamp Aff. ¶ 11); dkt. 223-8 at 16, 22 (Fessler Dep. at 64:2–4, 87:20–88:7).  Ultimately, the accusation was "found not to be credible."  Dkt. 210-9 at 3 (Hercamp Aff. ¶ 9).

The next semester, Mr. Livingston's female show-choir partner, A.B., accused him of  staring at her and "'touch[ing] her butt' on several occasions during choir class and other choir activities."  Dkt. 210-4 at 14 (Investigation Report).  NPHS investigated the allegations by interviewing those involved in the situation, including A.B., Mr. Livingston, and fifteen other witnesses.  *Id.*; dkt. 223-8 at 12 (Fessler Dep. at 47:12–48:23).  Ultimately, while the investigation "revealed no conclusive evidence that [Mr. Livingston's] actions were intentional," it concluded that "his actions did create an environment where some female students in the choir class were uncomfortable."  *Id.*  Mr. Livingston was not disciplined, dkt. 210-8 at 3 (Fessler Aff. ¶ 9), but the school

ordered that A.B. and Mr. Livingston would no longer be dance partners, dkt. 210-4 at 15.  After A.B.'s complaint was resolved, NPHS did not receive any more complaints of a similar nature against Mr. Livingston.  Dkt. 210-8 at 4 (Fessler Aff. ¶ 11).

### C. Mr. Livingston's transfer to EHHS

In December 2016—the end of the first semester of his junior year—Mr. Livingston requested a transfer to EHHS.  Dkt. 223-8 at 8 (Fessler Dep. at 32:10–14); dkt. 223-5 at 9 (Livingston Dep. at 8:1–4).  Mr. Livingston wanted to transfer because he was being bullied at NPHS, dkt. 223-5 at 9 (Livingston Dep. at 8:1–4); the NPHS administration did not encourage him to leave, dkt. 210-9 at 5–6 (Hercamp Aff. ¶ 18).

To start the transfer process, an EHHS administrator requested Mr. Livingston's records—including any disciplinary records—from NPHS.  Dkt. 210-4 at 8.  In response, NPHS sent over Mr. Livingston's disciplinary history— a blank sheet that said, "None."  *Id.* at 12.  That's because the laxative incident had been expunged, dkt. 210-9 at 2 (Hercamp Aff. ¶ 6), and any unverified allegation of sexual assault or harassment is not noted in a student's official record, dkt. 223-8 at 6 (Fessler Dep. at 21:9–13).

Administrators at NPHS also did not believe that Mr. Livingston had ever engaged in sexually inappropriate conduct toward another student and did not think he posed such a risk.  *See, e.g.*, dkt. 210-8 at 4 (Fessler Aff. ¶ 12).  So, when the EHHS principal called someone at NPHS to inquire about Mr. Livingston, he "did not hear anything that caused [him] to be alarmed."  Dkt.

6

223-1 at 13 (Pfaff Dep. at 50:10–13).  But the EHHS principal later said that, if he been told about the allegations against Mr. Livingston, he would have had "serious concerns" and would have investigated further.  *Id.* at 14, 32 (Pfaff Dep. at 56:20–57:1, 126:16–23).

EHHS officials accepted Mr. Livingston's transfer in January 2017.  *Id.* at 32 (Pfaff Dep. at 125:23–25); dkt. 221 at 2 (Truitt 2020 Aff. ¶ 11).  Before Mr. Livingston's encounter with E.C., EHHS officials investigated an incident involving an inappropriate email that Mr. Livingston had sent to a female student.  In this email, Mr. Livingston described having a "sexual foot fetish" and asked the female student to wear sandals.  Dkt. 221 at 4 (Truitt 2020 Aff. ¶ 17).  EHHS's assistant principal determined that the conversation was consensual, dkt. 223-13 at 3–4 (Truitt 2023 Decl. ¶ 15), but addressed the "inappropriate content" with Mr. Livingston, provided the email to both students' parents, and attempted to minimize their future interactions.  *Id.*

**D. E.C.'s prior relationship with K.D.**

In August 2017, an EHHS student named K.D. met E.C. at school and asked her to be his girlfriend.  Dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 28); dkt. 223-23 at 2 (Ebbert Decl. ¶ 6).  The designated evidence shows only that they held hands.  Dkt. 223-15 at 30, 35 (E.C. Dep. at 29:2–5, 34:5–11); dkt. 223-20 at 28 (Kim C. Dep. at 111:19–24).  E.C.'s mother, Kim, contacted the special education teacher, Ms. Ebbert, regarding E.C.'s and K.D.'s relationship.  Dkt. 223-23 at 2 (Ebbert Decl. ¶ 6).  Ms. Ebbert told Kim that she believed K.D. had

been "too touchy feely" with E.C. and Kim was afraid that K.D. would make "lewd comments to E.C." *Id.*; dkt. 223-20 at 28 (Kim C. Dep. at 110:9–10).

Kim instructed her daughter to stay away from K.D., and Ms. Ebbert told E.C.'s teachers to monitor her interactions with K.D. and informed them that Kim wanted them kept apart. Dkt. 223-23 at 2 (Ebbert Decl. ¶ 6); dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 28). E.C. and K.D. were in a class together, so the teacher made sure they did not sit next to each other and were not partnered for group work. Dkt. 223-23 at 2 (Ebbert Decl. ¶ 6). After this, Ms. Ebbert did not receive any reports about questionable interactions between K.D. and E.C. or hear any more concerns from Kim about the issue. Dkt. 223-23 at 2 (Ebbert Decl. ¶ 7). However, the assistant principal reported that the situation with K.D. made the school aware that E.C. was "especially susceptible to engage with boys who were interested in her," and that EHHS was "watching her carefully." Dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 28).

### D. Procedural history

By her parents as next friends, E.C. filed this lawsuit against Eastern Hancock, Southern Hancock, and Mr. Livingston. *See* dkt. 1; dkt. 50 (amended complaint).[5] Against Eastern Hancock and Southern Hancock, she brought claims under Title IX of the Education Amendments Act of 1972, codified at 20 U.S.C. § 1681, and Indiana negligence law. Dkt. 50 at 9–15. She also brought state-law claims of sexual battery, sexual assault, and intentional infliction of

---

[5] Mr. Livingston originally filed a counterclaim against E.C. for filing this suit in bad faith. *See* dkt. 23 at 38. However, when E.C. amended her complaint, Mr. Livingston did not re-allege that counterclaim in his answer. *See* dkt. 53.

emotional distress against Mr. Livingston.  *Id.* at 15–16.  Southern Hancock and Eastern Hancock filed motions for summary judgment.  Dkt. 210; dkt. 214.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584.  For issues of state law, absent a controlling decision from the Indiana Supreme Court, the Court does its best to predict how that court would rule on the issues of law. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021).  In doing so, the Court may consider decisions from the Indiana Court of Appeals. *See id.*

**III.**
**Analysis**

## A. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Because Title IX is based on an agreement to receive federal funds, "liability can attach only when the recipient of federal funds breaks its contractual promise not to 'use the funds in a discriminatory manner.'"  *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 541 (7th Cir. 2022) (en banc) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998)).  "And a recipient can be said to break that promise . . . only when it *knows* that the discrimination has occurred and fails to take reasonable action in response."  *Id.*  Therefore, to support a Title IX claim based on student-on-student sexual misconduct, "the misconduct in question must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school.'"  *Id.* (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).[6]

---

[6] While the text of Title IX does not create a private right of action, the Supreme Court has held that it "contains an implied cause of action in favor of private victims of discrimination."  *C.S.*, 34 F.4th at 540 (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)).

### 1. Southern Hancock

E.C. claims that Southern Hancock violated Title IX by being deliberately indifferent to Mr. Livingston's "peer-on-peer harassment" at NPHS and by facilitating Mr. Livingston's transfer to EHHS.  Dkt. 234 at 16.  Southern Hancock argues that it's entitled to summary judgment on this claim because E.C. never attended NPHS or any other Southern Hancock school and did not attempt to participate in Southern Hancock's educational opportunities.  Dkt. 222 at 18–22.

The Seventh Circuit has not directly addressed when a school can be liable under Title IX for a sexual assault when the plaintiff did not participate or attempt to participate in that school's educational opportunities.  Title IX's text, however, does not prohibit sexual assault or sexual harassment themselves, but prohibits discrimination in or denial of an "education program or activity."  20 U.S.C. § 1681(a); *see Doe v. Brown Univ.*, 896 F.3d 127, 132 (1st Cir. 2018).  The First and Sixth Circuits have therefore concluded that, for a school to be liable under Title IX, the plaintiff must have participated or attempted to participate in *the defendant's* educational programs or activities. *Doe*, 896 F.3d at 131–33; *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 707–08 (6th Cir. 2022).

*Doe* is particularly instructive because it relied on two Supreme Court opinions in reaching that conclusion.  First, the First Circuit looked to *North Haven Board of Education v. Bell*, which held that Title IX protected employees as well as students since employees could also be discriminated against in an

educational environment.  896 F.3d at 131 (citing 456 U.S. 512, 520–21 (1982)).  The Supreme Court explained in *Bell* that "a female employee who works in a federally funded education program is 'subjected to discrimination under' that program if" she is treated less favorably than male colleagues. This, the First Circuit recognized, was because that employee had "inferior access to or [was] less able to enjoy the benefits of a particular educational program."  *Id.* at 131.  *Bell* therefore "suggest[s] . . . that the scope of Title IX . . . is circumscribed to persons who experience discriminatory treatment while participating, or at least attempting to participate, in education programs or activities *provided by the defendant institution.*"  *Id.* at 132 (emphasis in original).

The First Circuit next looked to *Davis v. Monroe County Board of Education.  Id.* (citing 526 U.S. at 650).  In *Davis,* the Supreme Court held that a school can be liable for student-on-student sexual harassment, but only if it can "be said to deprive the victims of access to the educational opportunities or benefits *provided by the school.*"  *Id.* (emphasis in original).  Similarly, the Supreme Court discussed in *Davis* how harassment could "effectively den[y] equal access to *[the] institution's* resources and opportunities."  *Id.* at 132–33 (emphasis added).  The First Circuit therefore concluded that *Davis,* like *Bell,* "supports th[e] proposition" that Title IX's scope is limited to programs or activities "*provided by the defendant institution.*"  *Id.*  So, in *Doe,* the plaintiff—a Providence College student—had not raised a "plausible claim under Title IX"

12

because she "did not allege that she participated or even would have participated in any of Brown's educational programs or activities."  *Id.* at 133.

In short, *Doe* carefully applied Title IX's text and the Supreme Court cases interpreting it.  And E.C. has not cited any cases reaching a different conclusion.  *See* dkt. 234 at 12–16.  The Court finds the reasoning of *Doe* persuasive and therefore applies it here, as the Sixth Circuit has done.  *See Snyder-Hill*, 48 F.4th at 708 (finding that *Doe* "persuasively analyzes the issue" and holding that nonstudents could bring Title IX claims since they participated in summer wrestling camp or refereed games at the defendant institution); *Arocho v. Ohio Univ.*, No. 20-4239, 2022 WL 819734, at *2–4 (6th Cir. Mar. 18, 2022) (applying *Doe* and dismissing Title IX claim since plaintiff did not "allege that she intended to participate in any specific Ohio University education program").

Here, E.C. did not participate—or attempt to participate—in any educational program or activity offered by NPHS or Southern Hancock.  *See* dkt. 210-9 at 1–2 (Hercamp Aff. ¶ 4).  Therefore, no action or inaction attributable to Southern Hancock could have interfered with E.C.'s access to any of Southern Hancock's educational programs or activities.  That places E.C.'s claim against Southern Hancock beyond the scope of Title IX in this case.  *See Brown Univ.*, 896 F.3d at 133; *Davis*, 526 U.S. at 650.  So Southern

13

Hancock's motion for summary judgment is **GRANTED** as to E.C.'s Title IX

claim against it.[7]

### 2. Eastern Hancock

Eastern Hancock argues that it cannot be liable under Title IX because

E.C. has not designated evidence allowing a jury to find that EHHS was

deliberately indifferent or that its response to learning of E.C.'s allegations

against Mr. Livingston was clearly unreasonable.  Dkt. 224 at 25–29.  E.C.

responds that Eastern Hancock knew that she was vulnerable to engaging with

male students who were interested in her yet failed to step in and ward off

potential sexual harassment.  Dkt. 236 at 12–13.

"The Supreme Court has set a high bar for plaintiffs seeking to hold

schools and school officials liable [under Title IX] for student-on-student

harassment."  *Doe v. Galster*, 768 F.3d 611, 613–14 (7th Cir. 2014) (citing

*Davis*, 526 U.S. at 650); *accord C.S.*, 34 F.4th at 541 (The Title IX "framework

permits Title IX institutional liability only where the funding recipient engages

in intentional conduct that violates the clear terms of the statute.").  A Title IX

plaintiff therefore must make two showings.  First, the school must have

"*actual knowledge* of discrimination in the [school's] programs."  *C.S.*, 34 F.4th

at 541.  And second, the school's "response to that knowledge must amount to

deliberate indifference to discrimination reflecting an official decision by the

[school] not to remedy the violation."  *Id.*

---

[7] Because this issue is dispositive, the Court does not address whether Southern
Hancock had "substantial control" over the sexual assault or whether E.C. was
deprived of any educational benefit.  Dkt. 222 at 22–27.

Deliberate indifference is a "high bar" that is met only if the school's response to harassment is "clearly unreasonable." *Galster*, 768 F.3d at 619. Courts must be deferential to schools' disciplinary decisions, and plaintiffs are not entitled "to any specific remedial measure." *Id.* at 621; *see Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 ("[J]udges 'make poor vice principals.'"). Moreover, the school's response "does not have to be perfect or even successful." *C.S.*, 34 F.4th at 543. Instead, for the school to be liable, its action (or inaction) must "constitute an 'official decision' to permit discrimination," *id.*, like when a school "learn[s] of a problem and d[oes] nothing." *Johnson*, 972 F.3d at 912.

Here, when EHHS staff and E.C.'s mother expressed concerns about K.D.'s behavior[8] about a month before the bathroom incident between Mr. Livingston and E.C., EHHS responded with several safeguards:

- E.C.'s teachers were to monitor her interactions with K.D. and were informed that her mother wanted them kept apart.  Dkt. 223-23 at 2 (Ebbert Decl. ¶ 6); dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 28).
- In the class that E.C. and K.D. had together, their teacher made sure they did not sit next to each other and were not partnered for any group work.  Dkt. 223-23 at 2 (Ebbert Decl. ¶ 6).
- EHHS reported back to E.C.'s mother about these measures.  *Id.*; dkt. 223-19 at 15 (Mario C. Dep. at 135:15–17); dkt. 223-20 at 8 (Kim C. Dep. at 32:4–7).

---

[8] Eastern Hancock argues in reply that E.C.'s response attempted to "surreptitiously and belatedly amend her pleadings at the eleventh hour" by focusing on K.D. and his interactions with E.C.  Dkt. 243 at 3–5.  The Court does not address this argument because, as explained below, Eastern Hancock is regardless entitled to summary judgment on E.C.'s Title IX claim.

Ms. Ebbert didn't hear about any more questionable interactions between the two.  Dkt. 223-23 at 2 (Ebbert Decl. ¶ 7).  About a month later, K.D. introduced E.C. to Mr. Livingston at a school homecoming dance, *see, e.g.*, dkt. 223-5 at 39–40 (Livingston Dep. at 38:15–39:3), and Mr. Livingston and E.C. then texted each other for a brief time before Mr. Livingston asked E.C. to have sex with him in a school bathroom the next day.  Dkt. 223-17 at 18, 21–22.

When E.C. and Mr. Livingston held hands for a while on school grounds the next morning, Mr. Livingston was not aware of any EHHS staff who saw them do this, and the assistant principal said that someone would have reported it if they had.  Dkt. 223-6 at 37–38 (Livingston Dep. at 142:7–143:20); dkt. 223-12 at 6 (Truitt 2020 Aff. ¶ 29).  After Mr. Livingston met E.C. in the girls' restroom, EHHS administrators quickly learned about the incident, dkt. 223-12 at 5 (Truitt 2020 Aff. ¶ 21), and responded:

- They contacted both students' parents, the Indiana Department of Child Services, and the Sheriff's Department.  Dkt. 223-1 at 25 (Pfaff Dep. at 97:15–17); dkt. 223-5 at 100 (Livingston Dep. at 99:20–25); dkt. 223-20 at 16 (Kim C. Dep. at 61:4–62:17); dkt. 223-22 (Probable Cause Aff.).
- EHHS reached an agreement with Mr. Livingston's parents to allow him to finish his remaining courses remotely.  Dkt. 223-1 at 28–29 (Pfaff Dep. at 109:11–110:2, 113:9–114:7).
- The school also worked with E.C.'s parents and came up with a safety plan, which provided that E.C. would be escorted at all times on school grounds.  *Id.* at 29 (Pfaff Dep. at 116:6–22); dkt. 223-23 at 6–8.

E.C. does not appear to have been subject to further sexual harassment or assault during the remainder of her time at EHHS.  *See, e.g.*, dkt. 223-19 at 6 (Mario C. Dep. at 97:12–16).

16

The actions taken by EHHS demonstrate that this is not a case when a school "learn[s] of a problem and d[oes] nothing." *Johnson*, 972 F.3d at 912. Instead, upon discovering problematic behavior, it engaged in proactive steps to try to stop it from happening again. So even though EHHS's actions did not prevent E.C. and Mr. Livingston from interacting and engaging in sexual contact in the bathroom, schools are not liable merely if their response is ultimately unsuccessful. *C.S.*, 34 F.4th at 541; 543.

In *Johnson*, for example, Ms. Johnson's grandmother told school officials that her granddaughter had been raped by two other students. 972 F.3d at 908. The school knew of a previous rape allegation against one of those students and had issued a "no-contact order" for that previously accused student and the alleged victim. *Id.* Ms. Johnson sued, arguing that the school corporation violated Title IX since it knew of a prior accusation but did not thoroughly investigate it or expel the accused student. *Id.* at 912. The Seventh Circuit affirmed summary judgment for the school because, instead of "learn[ing] of a problem and [doing] nothing," the school deferred to outside investigations and issued a no-contact order. *Id.* Regardless of whether those actions may have been negligent, they were "not clearly unreasonable," so summary judgment was proper on the Title IX claim. *Id.* at 912–13.

The same is true here. Eastern Hancock responded promptly to each concern with measures designed to resolve it. Indeed, as in *Johnson*, once those measures were taken, there were no more complaints about the specific concerns. *See id.* at 912. "In fact, schools are not required to engage in any

17

specific forms of discipline, and [courts] will defer to the school's decisions so long as the school's response is not clearly unreasonable." *Id.* at 912–13.

Considering Eastern Hancock's responses to the specific conduct and risks it was aware of, E.C. has not designated evidence allowing a reasonable jury to find a "clearly unreasonable" response that constitutes "an 'official decision' to permit discrimination." *C.S.*, 34 F.4th at 543. Eastern Hancock's motion for summary judgment is therefore **GRANTED** as to E.C.'s Title IX claim against it.[9]

### B. Relinquishing Jurisdiction over the State-Law Claims

E.C.'s Title IX claims were her only federal claims. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co. v. BP Prods. N. Am.*, 672 F.3d 476, 479 (7th Cir. 2012); 28 U.S.C. § 1367(c). "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *RWJ Mgmt.*, 672 F.3d at 479. The Seventh Circuit has identified three exceptions "that may displace the presumption":

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or

---

[9] Since this issue is dispositive, the Court does not address Eastern Hancock's arguments about whether E.C. was deprived of equal access to educational opportunities. Dkt. 224 at 21–23.

> (3) when it is absolutely clear how the pendent claims
> can be decided.

*Id.* at 480.

Here, the factors weigh in favor of the Court's relinquishing jurisdiction over the remaining state-law claims. First, by bringing their state law claims in federal court under 28 U.S.C. § 1367(a), the Hueys tolled the statute of limitations on their state law claims. *Artis v. District of Columbia*, 138 S.Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock."). Second, substantial judicial resources have not been spent on any of the state-law claims. *RWJ*, 672 F.3d at 481 ("[C]oncerns about judicial economy have their greatest force when significant federal judicial resources have already been expended to decide the state claims.").[10]

Most importantly, "the resolution of the state claims in this case is far from clear." *Id.* To recover on her negligence claims against the school corporations, E.C. must show (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury proximately caused by that breach. *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016). Here, resolving E.C.'s negligence claim against Southern Hancock would require recognizing a new common-law duty by evaluating the relationship

---

[10] Eastern Hancock, E.C., and Mr. Livingston have not addressed retaining jurisdiction. Southern Hancock briefly argues in a footnote that the Court should retain jurisdiction over E.C.'s negligence claim against it because of the resources already committed to the case. Dkt. 222 at 27 n.3. While the Court has committed substantial resources to this case, virtually none have "been expended to decide *the state claims.*" *RWJ*, 672 F.3d at 481 (emphasis added).

between the parties, the foreseeability of harm, and public policy concerns. *Id.* at 387. It's unclear how the Indiana Supreme Court would define the foreseeability of harm, *see id.* 387, 393–94 (explaining that this factor looks to "the broad type of plaintiff and harm involved"), or how it would evaluate the relevant public policy concerns such as "how society should allocate the costs of such injury," *Estate of Staggs ex rel. Coulter v. ADS Logistics Co.*, 102 N.E.3d 319, 326 (Ind. Ct. App. 2018).

The outcome of E.C.'s negligence claim against Eastern Hancock is also uncertain under Indiana law. Schools may be liable if they breach their duty "to exercise reasonable care and supervision for the safety of the children under their control." *Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974). But Indiana courts have not clarified how that rule applies in negligence claims based on a sexual assault, *see* dkt. 236 at 15–16, including whether courts should apply the factor-based test used in physical-assault cases, *see McClyde v. Archdiocese of Indianapolis*, 752 N.E.2d 229, 233 (Ind. Ct. App. 2001).

Last, for E.C.'s claims of sexual battery, sexual assault, and intentional infliction of emotional distress against Mr. Livingston, neither E.C. nor Mr. Livingston moved for summary judgment on these counts, so it appears that they must be resolved at trial.

Given the Court's resolution of the federal claims and the nature of E.C.'s remaining claims, then, "the center of gravity in the case has shifted to [Indiana negligence and sexual-assault law]; these are issues ideally decided by an [Indiana] judge applying [Indiana] law." *RWJ*, 672 F.3d at 481. And when "the

20

relevant state law is unsettled, the presumption in favor of relinquishment is particularly strong." *Id.*

In sum, the factors weigh in favor of the Court's relinquishing supplemental jurisdiction over E.C.'s state law claims.  The parties shall have through **September 22, 2023 to show cause why the Court should not dismiss the state law claims without prejudice**.

### IV.
### Conclusion

Eastern Hancock and Southern Hancock's motions for summary judgment are **GRANTED** as to E.C.'s Title IX claims against them.  Dkt. [210]; dkt. [214].

The parties **shall have through September 22, 2023** to show cause why the Court should not relinquish jurisdiction over E.C.'s state-law claims against the school corporations and Mr. Livingston.  If the parties do not respond, the Court will dismiss the state-law claims without prejudice.

**SO ORDERED.**

Date: 9/11/2023

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel